**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ALBERT G. GIVENS, #233-854 | * | |
| Petitioner | * | |
| v | * | Civil Action No. JFM-12-3235 |
| BOBBY P. SHEARIN, et al. | * | |
| Respondents | * | |
| | *** | |

**MEMORANDUM**

Pending is Albert Givens' ("Givens")[1] petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. (ECF No. 1).  Respondents, by their counsel, have filed a response (ECF No. 16), to which Givens who is self-represented, has replied. (ECF No. 20). After considering the pleadings, exhibits, and applicable law, the court determines a hearing is unnecessary. *See* Local Rule 105.6 (D. Md. 2014); Rule 8, "Rules Governing Section 2254 Proceedings in the United States District Courts."

**BACKGROUND**

Givens is challenging his 2006 first-degree murder conviction in the Circuit Court for Anne Arundel County, Maryland. Givens' prosecution resulted in five jury trials and this case has a long procedural history.

---

[1]   Givens is currently incarcerated at the Maryland Correctional Training Center in Hagerstown, Maryland where Richard D. Dovey is warden. *See Rumsfeld v. Padilla*, 542 U.S. 426, 434-47 (2004) (stating the writ should be directed to the "person who has the immediate custody of the party detained, with the power to produce the body of such party before the court or judge."); *see also* 28 U.S.C. § 2243 (providing that any habeas petition must be directed at "the person having custody of the person detained'). *See also*  Fed. R. Civ. P. 25(d) (1) (substitution of officials). Accordingly, Richard D. Dovey will be substituted in lieu of Bobby Shearin as defendant by separate order.

### 1.  Procedural Background

Givens was tried and convicted of first-degree murder on April 14, 1993.  (Resp. Ex. 1).

Givens was granted a new trial in post-conviction proceedings. *Id*. [2]  The second trial resulted in

a hung jury on May 16, 2003.  *Id*.  Givens' was convicted of  first-degree murder after his third

trial in January of 2004; that judgment was reversed on direct appeal by the Court of Special

Appeals of Maryland and a fourth trial was ordered. *Id*.  Givens' fourth trial ended in a mistrial

on evidentiary grounds on April 4, 2006. *Id*.[3]

Givens was convicted of first-degree murder by a fifth jury on December 6, 2006. *Id*. He

was sentenced to life imprisonment without parole on January 8, 2007. (Resp. Ex. 10). On direct

appeal, Givens, by his appellate attorney, raised the following allegations of error: 1) whether the

trial court abused its discretion by excluding evidence of alleged prior violent acts of the victim's

son; 2) whether the trial court abused its discretion by excluding relevant evidence; 3) whether

the trial court abused its discretion by permitting the prosecutor's closing arguments; 4) whether

the trial court abused its discretion by refusing to declare a mistrial; 5) whether the trial court

abused its discretion in limiting expert testimony on the issue of the reliability of identification

testimony; 6) whether the trial court abused its discretion in the manner in which the jury was

instructed on eyewitness identification; 7) whether the trial court abused its discretion in

permitting the scope of the State's cross-examination of the appellant; 8) whether the trial court

abused its discretion in limiting defense rehabilitation evidence; and 9) whether the trial court

erred by admitting hearsay evidence and abused its discretion by precluding evidence of prior

acquittals. (Pet. Ex. A; Resp. Ex 12).

---

[2] The first post-conviction court's decision is not included in the record.

[3] Givens' fourth trial ended on April 4, 2006, when a State's witness, the victim's daughter, blurted out prejudicial hearsay evidence.  *See* Resp. Ex 11 n. 3.

On February 4, 2010, the Court of Special Appeals of Maryland issued an unpublished opinion which affirmed the conviction. (Resp. Ex. 12).  In an order filed on June 11, 2010, the Court of Appeals of Maryland denied further review.  (Resp. Exhibit 14).

On July 20, 2010, Givens filed a petition for post-conviction relief in the Circuit Court for Anne Arundel County, alleging three categories of error: 1) prosecutorial misconduct; 2) trial court error; and 3) ineffective assistance of trial counsel.  (Pet. Ex. C, p. 2 ; Resp. Ex. 15, pp. 29-30).[4] Givens, his father, and William Davis, Esq., one of Givens' trial attorneys,[5] testified at the post-conviction hearing held on July 28, 2011. (Resp. Ex. 15).  On October 11, 2011, the state post-conviction court denied relief.  (Pet. Ex. D).

Givens filed an application for leave to appeal denial of his post-conviction petition asserting (A) prosecutorial misconduct for 1) failing to disclose footprint evidence, 2) presenting a false closing argument, and 3) presenting her personal opinion in closing argument; (B) trial court error for  1) denying him his right to counsel, 2) being biased against him, and 3) not issuing a deadly weapon instruction; and (C) ineffective assistance of trial counsel for 1) failing to present exculpatory evidence, 2) failing to object to the prosecutor's false closing argument, 3) failing to object to the prosecutor providing her personal opinion in closing argument, (4) failing to cross-examine Matt Peterson effectively, (5) failing to move suppress a wrench and a tool box, (6) failing to challenge car measurements, and (7) failing to raise the cumulative effect of these errors. (Pet. Ex. E). In an unreported opinion filed on October 3, 2012, the Court of Special Appeals summarily denied leave to appeal.  (Pet. Ex. F)

---

[4]  Givens filed his post-conviction and supplement pro se.  He was represented by counsel at the post-conviction hearing.  (Pet. Ex. C; Resp. Ex. 15, p. 14).  The petition for post-conviction relief, as amended, raised twenty-two allegations of error.  (Pet. Ex. C and D).

[5]  Givens was also represented at trial by Patrick Kent, who specialized in forensic issues. (Resp. Ex 15, pp. 93, 96; Pet. Ex. D, pp. 14-15).

**2. Factual Background**

In its opinion affirming Given's December 6, 2006, conviction, the Court of Special

Appeals summarized the facts adduced at trial:

> Marlene Kilpatrick was murdered in early January, 1992. On January 3, 1992, Ms. Kilpatrick's daughter, Lisa Kilpatrick O'Connell, discovered her mother's body at the victim's Arnold, Maryland home. Lisa had been concerned when she did not hear from her mother after speaking with her on New Year's evening. After attempting, without success, to reach her mother by telephone at about 9:30 a.m. on January 2nd, Lisa went to her mother's home later that morning. Lisa entered the house and discovered Ms. Kilpatrick's body. A blood trail went from the kitchen of the small home to the bedroom. The evidence showed that the victim suffered from multiple fractures caused by blunt-force injuries to the skull, as well as stab wounds to the torso. A Sprite soft drink bottle had been inserted into the victim's vagina. The handle of a knife was protruding from Ms. Kilpatrick's chest. Another knife was also found at the scene, lying on the victim's chest near a gaping wound in the victim's chest or upper abdomen. A white telephone cord was draped over the victim's neck. A substance identified as fruit jelly had been smeared on the victim's vaginal area. A fuel injector cleaner bottle was resting against the victim's right side, and a forensic technician detected the odor of fuel injector cleaner in the victim's mouth and vaginal area.
>
> The appellant was known to the victim's family. Lisa testified that the appellant had performed odd jobs such as house painting and repairs, and had been a friend of Ms. Kilpatrick's son, Jay Kilpatrick.
>
> The appellant testified that he had known Ms. Kilpatrick for about two years, and was acquainted with her son, Jay, for ten to fifteen years. He recalled that on the evening of January 1, 1992, he was at the home of a friend, Wayne Williams, who lived on Bembe Beach Road. The appellant spent the night there and left the following morning, January 2nd, intending to go home. On the way, he met Jay Kilpatrick, who was accompanied by a friend named "Matt." Taking the appellant's car, the three drove to Ms. Kilpatrick's house. Once there, Jay and Matt entered the house while the appellant stayed in the car. After waiting in the car for 15 minutes, the appellant knocked on the door. Jay opened the door and the appellant entered. Ms. Kilpatrick was seated in the kitchen, and offered the appellant a soft drink, a bottle of Coca Cola.
>
> The appellant testified that Jay and Ms. Kilpatrick began to argue, and Jay struck Ms. Kilpatrick on the head. When the appellant tried to assist her by pulling Jay away from her, Jay lost his balance. Jay then brandished a knife and threatened the appellant and his family if he mentioned the incident to

anyone. The appellant left. Shaken by the incident, he went home. He did not call Ms. Kilpatrick to inquire whether she was okay, nor did he call the police. After Jay told him to leave his house and mind his own business, the appellant "assumed everything was going to be alright." When the appellant encountered Jay the following morning, the latter admitted, "Albert, I've beat and stabbed my mother to death.

Gordon Clement owns Clement Hardware store in Severna Park. He arrived at the store at about 6:55 a.m. on the morning of January 2nd. There were no other cars in the parking lot when he arrived. At approximately 7:30 a.m., Clement was looking out of the store window when he observed a man walking in front of his store. The man was about 10 to 15 feet away from Clement, and Clement recalled that the man was heavyset with a scruff. The man wore a fatigue jacket, leather shoes or boots, and dark pants. He appeared to be either "very tired or that he had a limp[,]" and was startled to see Clement looking out at him. He hunched up his coat when he noticed Clement. Clement said that he watched this man for 30 to 60 seconds. At approximately 9:30 that morning, Clement noticed that a car was parked in the lot. The car had not been there at 7:00 a.m. when Clement arrived at work, and the man whom he had observed walking in front of the store appeared to have come from the direction of where the car was parked.

 The car was still in the parking lot when Clement arrived at work the following morning. On January 4th, Clement heard a radio broadcast about a missing car, and an employee of the hardware store confirmed that the car in the parking lot matched that description. Clement asked the employee to call the police. It was determined that the car belonged to Ms. Kilpatrick. The police contacted Clement, and he told them about the man he had seen on the morning of January 2nd. Clement mentioned seeing the man, because "there aren't a lot of pedestrians in Severna Park. . . people just don't walk."

The police showed a photo array to Clement, who ruled out the appellant's photograph because it depicted a person who was "too old." The photograph of a second person was instead chosen, with Clement expressing a "seven out of ten" certainty that the photograph of the other person depicted the man he had seen. Roughly a year later, Clement eventually identified the appellant after he saw appellant's photograph on the front page of a local newspaper. The photograph accompanied an article that mentioned that a suspect had been arrested in the Arnold murder. Clement testified that he had yet to read the article itself before he noticed the headline photograph. Clement informed the police that the news photograph showed the man he had seen that morning outside of his store. He explained his identification from the newspaper picture because it depicted a "look" and angle similar to the individual he had seen cross in front of his store.

There was testimony concerning the provenance of the lacerations that were observed on the victim's scalp. A toolbox was recovered from the appellant's car. Dr. William Vosburgh, a forensic scientist who testified for the State, inspected the contents of the toolbox and said that, of the 162 tools that were contained in the box, a large crescent wrench was the only tool that appeared to have been cleaned. There were conflicting opinions as to whether the lacerations were indicative of blows from that wrench. The State's Chief Medical Examiner, Dr. David Fowler, opined that an object with the dimensions of the wrench caused the head injuries. The autopsy prosecutor, Dr. Frank Peretti, disagreed with Dr. Fowler's opinion, and concluded that the head injuries were nondescript and showed no pattern. The defense also offered the opinions of Dr. Richard Callery, the Chief Medical Examiner for the State of Delaware, and Dr. James Gill. These experts were far less certain that the wrench would have been implicated based on the victim's lacerations.

Dr. Charlotte Word had been an employee of CellMark Diagnostics, the laboratory that conducted the DNA testing on a Coca Cola bottle that was found in Ms. Kilpatrick's kitchen. Dr. Word was received as an expert in DNA analysis, interpretation, and testing. She testified that analysis of the Coca Cola bottle sample and a known blood sample of the appellant "told us that the results obtained from the swab from the [Coca Cola] bottle were the same results as the test results obtained from the blood of Mr. Givens." In 1992, the statistical correlation would be that "roughly six out of a hundred people in the general population would have those type [.]" More advanced or complete testing was conducted in 1999, and Dr. Word opined that "within a reasonable degree of scientific certainty Albert Givens is the source of the DNA on the swab from the coke bottle."

The State presented the rebuttal testimony of Lisa O'Connell, who recalled that, when she saw Ms. Kilpatrick and Jay together at a Christmas party in 1991, the two got along very well. In 1992 and 1993, Matthew Peterson lived in Annapolis and worked at a boatyard with Jay. Peterson denied visiting Ms. Kilpatrick's home.

(Resp. Ex. 12, pp. 2-7).

## CLAIMS PRESENTED

Givens claims for federal habeas corpus relief are: 1) the prosecutor committed misconduct by: A) failing to disclose footprint evidence; B) presenting a false closing argument regarding his hair color; C) presenting her personal opinion in closing argument regarding different ink colors found on a yellow post-it note; 2) the trial court violated his constitutional

rights by A) ordering counsel not to consult with him during a trial recess; B) showing bias against him; and C) issuing defective jury instructions; and 3) trial counsel was ineffective for A) failing to present exculpatory evidence; B) failing to object to the prosecutor's comment in closing argument that he lied about his hair color; C) failing to object to the prosecutor providing her personal opinion with respect to the different colors or ink on a yellow post-it not at the crime scene; 4) failing to cross-examine Matt Peterson effectively; 5) failing to move to suppress a wrench and a tool box; 6) failing to challenge car measurements; and 7) failing to raise the cumulative effect of these errors.  (Petition, pp. 6-15).

## DISCUSSION

### 1.  Procedural Default

As a threshold matter, Givens' claims are subject to the doctrine of procedural default ensures that "state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." *Picard v. Connor*, 404 U.S. 270, 276 (1971); *see also* 28 U.S.C. § 2254(b)(1)(A) (requiring exhaustion of remedies available in state court). Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal, or by failing to timely note an appeal, the procedural default doctrine applies. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478, 489–91(1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U.S. 41, 46–47 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F.Supp. 479, 482 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief).

When a claim is procedurally defaulted, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show 1) both cause for the default and

prejudice that would result from failing to consider the claim on the merits, or 2) that failure to consider the claim on the merits would result in a miscarriage of justice, i.e., the conviction of one who is actually innocent. *See Schlup v. Delo*, 513 U.S. 298, 314–16 (1995); *Murray*, 477 U.S. at 495–96; *Breard v. Pruett*, 134 F.3d 615, 620 (4th Cir. 1998). "Cause" consists of "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in state court at the appropriate time." *Breard*, 134 F.3d at 620 (quoting *Murray*, 477 U.S. at 488) (internal quotation marks omitted).

### 2.  Standard of Review

Givens' claims will be analyzed under the statutory framework of the federal habeas statute at 28 U.S.C. § 2254 which sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997); *see also Bell v. Cone*, 543 U.S. 447, 455 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, __U.S. __, __, 131 S.Ct. 1388, 1398 (2011) (internal quotation marks and citations omitted); *see also White v Woodall*, 2014 WL 1612424, * 4 (April 23, 2014, U.S.__, 134 S. Ct 1697, quoting *Harrington v. Richter*, __U.S. __, __, 131 S. Ct. 770, 786-87 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, (2010) (quoting *Williams*, 529 U.S. at 411). "Rather, that application must be objectively unreasonable." *Id.* Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington*, 131 S.Ct. at 785 (internal quotation marks and citation omitted).

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* (internal quotation marks and citation omitted).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where

the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379 (quoting 28 U .S.C. § 2254(e)(1)).

## DISCUSSION

### 1.  Prosecutorial Misconduct Claims

The Supreme Court has recognized that prosecutorial misconduct may be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). "[T]he test for reversible prosecutorial misconduct generally has two components: that (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Chorman*, 910 F.2d 102, 103 (4th Cir. 1990). In order to establish prejudicial misconduct on the part of the prosecutor the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180–81 (1986); *see also United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010).

Related to Givens' claims of prosecutorial misconduct is his claim that the prosecution withheld footprint evidence found at the crime scene. Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution is required to disclose material evidence favorable to the defendant. *See United States v. McLean*, 715 F.3d 129, 142 (4th Cir. 2013). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." *United States v. Curtis*, 931 F.2d 1011, 1014 (4th Cir. 1991) (internal quotation marks and citation omitted). Givens claims that the prosecutor committed misconduct by failing to disclose footprint evidence, presenting a false closing argument that Givens lied about his hair color, and presenting her personal opinion in closing argument about evidence found at the crime scene (different ink colors found on a yellow post-it note). (Petition, pp.  6-8). The state post-conviction court determined the latter two claims, both pertaining to the prosecutor's closing argument, waived because Givens could have, but failed to raise them on direct appeal. (Pet. Exhibit D, pp. 8-9).  As such, both claims are procedurally defaulted and will not be considered on the merits. Notably, Givens does not demonstrate cause or prejudice or actual innocence to excuse this procedural default.

Even if they were not procedurally defaulted, neither claim establishes a basis for federal habeas corpus relief.  Givens' challenges to the prosecutor's closing argument at trial are unsupported by the record. (Resp. Exhibit 15, pp. 132-35; Resp. Exhibit 8 pp. 129-225). Givens fails to show the allegedly improper remarks were made and prejudicially affected his substantial rights so as to deprive him of due process. Accordingly, there are no grounds for federal habeas relief. *See U.S. v. Roane*, 378 F.3d, 382 401 (4th Cir. 2004) (holding that conclusory allegations of prosecutorial misconduct do not form a basis for relief).

This court next turns to Givens' claim of prosecutorial misconduct for failure to disclose footprint evidence.    The post-conviction court rejected this claim, stating:

> In his Petition, Mr. Givens states that "[police discovered footprints located on the west side of the victims [sic] residence." Mr. Givens states that the police and/or State had photographs of footprints which were lost sometime between the Petitioner's first trial, and his most recent trial in 2006, and that these footprints were not consistent with any of the shoes that he owned at the time of the murder. [footnote 6].  Assuming that evidence was available, was considered admissible, and was somehow useful to the defense, the photographs are not capable of clearing or tending to clear Mr. Givens of guilt.  This evidence does

not give the Court any indication as to whose footprints are depicted in the photograph or when the footprints were made. Without the aforementioned details, it is difficult to see how these photographs could exonerate Mr. Givens. The photographs could depict Mr. Givens' footprints, or the footprints could have been made by someone else, days, weeks or even months before Ms. Kilpatrick was murdered.

Furthermore, and most importantly, Mr. Givens admitted during his 2006 trial that he had visited Ms. Kilpatrick's house on the day that she was murdered which makes this particular allegation by the Petitioner even more specious.

Mr. Givens has not shown that his trial was fundamentally unfair due to the withholding of the photographs. In addition, there was really no evidence presented that these photographs were withheld or suppressed in the classic sense, simply that they had been inadvertently lost sometime during the roughly 14 year period that expired between the time they were taken and the time of the Petitioner's 2006 trial.

***************

[6.] It was also noted that the Petitioner's shoes and clothing were not seized until a number of days after the murder had occurred which makes this allegation less relevant.

(Pet. Ex. D, pp. 10).

The state-post conviction court's decision is well supported in the record. During

the post-conviction hearing, Assistant States Attorney Virginia Miles told the court:

I will proffer now because we will be doing this very soon, that back in 2003, at I want to say trial number two there was actual testimony by Mr. Kovar that impressions were seen by the evidence technician on the ground that at the time they were deemed by Mr. Kovar and Technician Beall to be unsuitable for comparison. There was not tread in them, there were no distinct characteristics that would have made them valuable as evidence. So, that determination was made at the scene.

However, in an abundance of caution Mr. Kover, who was the evidence supervisor at the time, directed the technician to take photos of them anyway, so to speak, just because.

When it came time to prepare the case for trial in 2003, the photos, the negatives of these photos were gone, had been gone, the police department could not locate them and he testified to that in 2003. They were done then, they have been gone, they have never been suppressed by the State, they could not just be found at the police department and I will—

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> They do not exist and in any event the sworn testimony of the forensics supervisor was not the information captured in them was not going to be relevant for a scientific or any sort of comparative basis in any event, but they do not now exist.

(Resp. Ex. 15, p. 12).

Givens' trial counsel at his fifth trial testified during the post-conviction hearing during cross-examination that the footprint evidence would not have been helpful at trial.

> MR. LYNN [Pet. Post-Conviction Counsel]: Is there any reason why you may have believed that footprints, photographs of footprints would have been helpful to the Petitioner at trial?
>
> WILLIAM DAVIS [Trial Counsel]: Not under the theory we presented, no.
>
> MR. LYNN: Because the theory you presented was that Mr. Givens was at the Kilpatrick house on the 2nd of January.
>
> WILLIAM DAVIS: Right, along with her son, so the footprints unless we could get them to match Jay's footprint to prove that Jay was there but I think they have lost that evidence, I don't think it was failure to provide, I think was lost if I was not mistaken.

*Id.* p. 116.[6]

The post-conviction court's decision is well supported by the record. First, the footprint evidence was neither suppressed, nor withheld by the prosecution. *See California v. Trombetta,* 467 U.S. 479 (1984) (holding that, for *Brady* to apply, "evidence must . . . possess an exculpatory value that was apparent before the evidence was destroyed"); *Arizona v. Youngblood,* 488 U.S. 51 (1988) (holding that the State's failure to preserve "potentially useful" evidence does not constitute a due process violation unless the defendant can show bad faith on the part of the police). Second, Givens does not demonstrate the footprint evidence was favorable

---

[6] The defense's theory of the case was that Givens was actually present in the victim's home, but Jay Kilpatrick had committed the murder.  (Resp. Ex. 15, p. 105).

or material to his defense.  Indeed, testimony provided at the post-conviction hearing established the footprint evidence was not helpful to Givens in light of the defense's theory of the case at trial. For these reasons, Givens does not show state court decision was an unreasonable application of clearly established Supreme Court law or based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d).  This claim provides no basis to disturb the state court's ruling and federal habeas relief will be denied.

### 2.  Ineffective Assistance of Counsel Claims

In order to establish ineffective assistance of counsel, a petitioner must show that: 1) counsel's performance was deficient, and 2) the performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To satisfy the first part of this standard, it must be demonstrated that counsel's performance was not "within the range of competence normally demanded of attorneys in criminal cases." *Id*. at 687 (internal quotation marks and citation omitted). Representation is deficient if it falls below "an objective standard of reasonableness." *Id*. at 688. The standard for assessing such competence is "highly deferential" and has a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id*. at 689. A federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. A defendant must overcome the " 'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.' " *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington*, 131 S.Ct. at 790 (internal quotation marks and citation omitted). "The

standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S.Ct. at 788 (internal citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

Showing prejudice, the second requirement of the *Strickland* standard, requires that 1) counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable, and 2) there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 687, 694. "The benchmark [of an ineffective assistance claim] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687; *Harrington*, 131 S.Ct. at 787–88 (citing *Strickland*, 466 U.S. at 687). A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. *Strickland*, 466 U.S. at 697.

### A.  Claims that Trial Counsel Failed to Present Exculpatory Evidence

#### 1.  Witness Testimony

Givens faults trial counsel for failing to call his mother, Ellen Hockenberry to testify.  He also asserts that testimony should have been produced from Charles Peters, Sonny Amos, and James Amos to rebut the State's evidence against him. (Pet. pp. 9-13).  Additionally, he claims trial counsel did not effectively cross-examine witnesses Matthew Peterson and Dr. William

Vosburgh. *Id.*  These claims were considered and denied by the post-conviction court which stated:

> Mr. Givens contends that his trial counsel acted deficiently because counsel did not offer testimony of Ellen M. Hockenberry, Charles Peters, Sonny Amos, Jr., or James Amos, Sr. Mr. Givens asserts that these aforementioned individuals would have provided exculpatory testimony. Additionally, Mr. Givens argues that his trial counsel should have elicited testimony from Dr. Vosburgh about how Mr. Givens' clothing and articles did not contain traces of blood. Mr. Givens also asserts that his trial counsel did not effectively cross examine Matthew Peterson.

> Starting with Sonny and James Amos, Mr. Givens states in his Petition that the testimony of these two individuals would be exculpatory because their testimony "was in regard to alleged facts of the case that were not released to the public according to the State." The specific issue raised in the testimony was that the condition of the victim was known to several members of the public besides Mr. Givens. Apparently, at an earlier trial the State alleged that the Petitioner knew information that the police had not yet released, and as a result, this was evidence of his being present at the crime scene and/or committing the murder. However, Mr. Givens' trial attorney explained that Sonny and James Amos did not need to testify because this information was elicited from Mr. Givens' aunt during the 2006 trial. In addition, the State had abandoned the argument that the Petitioner had information that had not yet been released to the public in general. Accordingly, Mr. Givens' claim for ineffective assistance of counsel for failure to call the aforementioned witnesses is hereby DENIED.

> Mr. Givens' assertion that his trial counsel was deficient for failing to produce Mr. Peters' testimony from a prior trial also lacks merit. In his Petition, Mr. Givens states that Mr. Peters saw a "person who took a cab from a 7-11 to a location near the victims [sic] home on January 2, 1992." It is difficult to understand how this testimony would assist Mr. Givens. Throughout his most recent trial, Mr. Givens contended that the victim's son, Jay Kilpatrick, killed his mother, partially in the presence of Mr. Givens. Whether an individual took a cab ride near the victim's home does not have any significant effect on the defense theory. The defense theory was the Petitioner drove his own car to the victim's home, along with the victim's son and another man, and then left in his own car. In fact, the introduction of testimony previously provided by Mr. Peters could support the State's theory that Mr. Givens drove Ms. Kilpatrick's car to the hardware store, abandoned it, and then needed to return to Ms. Kilpatrick's home (possibly via a taxi cab) to retrieve his own car. The decision not to introduce Mr. Peters' prior testimony was a tactical one. Mr. Givens' claim for ineffective assistance of counsel for failing to produce Mr. Peters' testimony from a prior trial is hereby DENIED.

During the Post Conviction hearing, Mr. Givens stated that his trial counsel should have questioned Matthew Peterson about how he heard of the murder. According to Mr. Givens, Mr. Peterson definitively testified during the trial that he learned about the murder on January 2, 1992, between the hours of 9:00 am and 10:00 am, even though the victim's body was not discovered until approximately 24 hours later, and the crime was not publicized until days later. Mr. Peterson's testimony was brief, and the discussion about the events on January 2, 1992 was initiated by Mr. Givens' trial counsel. The relevant portion of his testimony is set forth below.

> Q: So the first time you knew [Jay] had a mother was the day that, I guess, these police officers came to the boatyard.
>
> A: Yes.
>
> Q. Okay. And what day was it that they came to the boatyard?
>
> A: I believe it was the second.
>
> Q. January 2. And are your sure about that?
>
> A: No.

*State v. Givens*, K,92-2270 December 5, 2006 Transcript p. 100.

The only time Mr. Peterson mentioned a specific date was in reference to the time that police officers visited his workplace to inform the victim's son that his mother was murdered. The Petitioner's allegation that Mr. Peterson definitively stated that the murder occurred on January 2, 1992, between the hours of 9:00 am and 10:00 am is inaccurate. As it turns out, a review of the transcript reflects that Mr. Peterson was not sure if the date he mentioned was correct. Mr. Givens' characterization of Mr. Peterson's testimony is incorrect. Therefore Mr. Givens' claim for ineffective assistance of counsel for failure to adequately question Mr. Peterson is hereby DENIED.

The remaining two contentions raised by Mr. Givens in this section require additional discussion. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable` professional assistance. *Strickland*, 466 U.S at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

Mr. Givens argues that his trial counsel acted deficiently because counsel did not introduce into evidence Ms. Hockenberry's testimony from a prior trial. At the time of Mr. Givens' latest trial, Ms. Hockenberry was suffering from a significant medical condition which precluded her from appearing in Court to testify. Trial counsel explained that he did not introduce the former testimony of Ms. Hockenberry because her testimony was no longer relevant to the defense theory. During the Petitioner's first trial, the defense theory was that Mr. Givens never visited Ms. Kilpatrick's house. To support this theory, Ms. Hockenberry testified that Mr. Givens was with her on the day Ms. Kilpatrick was murdered. In the latest trial, Mr. Givens admitted that he visited Ms. Kilpatrick's house on the day of the crime, and therefore trial counsel determined that this alibi evidence was unnecessary. Trial counsel made a tactical decision not to introduce Ms. Hockenberry's former testimony, and, that decision will not be second guessed by this Court. *See* Curtis, 284 Md. at 146, Accordingly, Mr. Givens' claim for ineffective assistance of counsel for failure to introduce Ms. Hockenberry's prior testimony is hereby DENIED.

Mr. Givens also argues that his trial counsel was deficient because counsel did not "fully discuss the fact that [Mr. Givens'] tools and clothes all tested negative for the presence of blood, from the victim." In fact, testimony was elicited from Dr. Vosburgh that each was tested and the results were "negative" (*State v. Givens*, K-92-2270 November 30, 2006 Transcript p. 149). In addition, there was no evidence presented that Dr. Vosburgh tested any articles of the Petitioner's clothing.

On a related matter, Dr. Vosburgh testified during the trial that the wrench seized from Mr. Givens' car contained scratches but was in a rather clean condition. The State introduced this testimony to suggest that Mr. Givens had cleaned the wrench, Defense counsel objected to the State's characterization of the use of the wrench because it could circumstantially indicate that Mr. Givens committed the murder. Mr. Givens now contends that his attorneys should have focused on the absence of blood on the tools. However, if the attorneys employed Mr. Givens' tactic, it might tend to support the State's theory that Mr. Givens cleaned the wrench to remove traces of blood. The decision not to further discuss the absence of blood was a reasonable tactical decision. *See Curtis*, 284 Md. at 146. Accordingly, Mr. Givens' claim for ineffective assistance of counsel for failure to mention the absence of blood is hereby DENIED.

(Pet. Exhibit D, pp. 11-14).

The state post-conviction court's adjudication of these claims of ineffective assistance was a reasonable application of *Strickland* and its progeny. Trial counsel explained, and the court credited, his strategic reasons for not producing the testimony of Ellen Hockenberry, Charles

Peters, Sonny Amos, and James Amos. (Resp. Ex. 15, 11-14, 104-10, 122, and 140-42).[7]

Notably, Givens does not demonstrate how he suffered prejudice as a result. The post-conviction

court's decision that counsel's examinations of Matt Peterson and Dr. Vosburgh reflect tactical

decisions is supported by the record, and is entitled to deference on federal habeas review.  The

post-conviction court's determination that counsel's actions were not constitutionally deficient is

entitled to deference and will not be disturbed.

## 2.   Physical Evidence

Next, Givens claims that trial counsel was ineffective for failing to introduce into

evidence a five-page report  by Robert Radnoti, a chemist for the Maryland State Police. (Resp.

Ex. 15, p. 65). That report contained the results of items tested for hair evidence. *See id*.  When

asked at the post-conviction hearing why the report was not introduced into evidence, trial

counsel answered,  "[w]ell, I know we called Mr. Radnoti to testify and he testified to the report.

I don't know why we wouldn't have tried to admit that, I don't know why. It seems to me we

that [sic] we should have tried to admit that." *Id*. p. 114.

Since the information in the report was presented at trial by way of Mr. Radnoti's

testimony, the post-conviction court found Givens' claim of ineffective assistance unavailing and

stated:

---

[7]  Trial counsel testified that Ellen Hockenberry had testified at an earlier trial as an alibi witness. (Resp. Ex 15 p. 104). Counsel explained that since the defense's theory at the fifth trial was that Givens had been at the Kilpatrick home, but did not commit the murder, there was no need for an alibi witness. *See id*. pp. 104-05.  Mr. Peters was a cabdriver who picked up a fare on the morning of the murder not far from Clement's Hardware, and drove the passenger back in the direction of the victim's house.  *See id*. pp. 106.  At the post-conviction hearing, trial counsel testified that Peters' testimony was more consistent with the State's theory of the case than that of the defense.  *See id*. p. 9.  Sonny Amos Jr. and James Amos Sr. testified it was public information that a bottle had been inserted in the victim's vagina. *See id*. pp. 51-53, 111. Defense counsel testified the Amos' testimony was used at an earlier trial to refute the State's theory that Givens had provided this information to the police and would not be privy to such information unless he was the perpetrator. *See id*.  Trial counsel testified the same information was provided by Given's aunt, Mrs. Miller, at the fifth trial. (Resp. Ex. 7, Ex. 15 at 141).

The report summarized several comparisons of hair samples found in the victim's home and vehicle with Mr. Givens' hair. In the report, Mr. Radnoti concluded that none of the hair samples found in the victim's home or car matched the hair sample provided by Mr. Givens. Although the report was not entered into evidence, Mr. Radnoti discussed the contents of his report during his direct examination. *See State v. Givens*, K-92-2270 November 28, 2006 Transcript p. 208-11 (explaining that the hairs found in the victim's vehicle and on the victim's clothing were not consistent with Mr. Givens hair samples). Additionally, upon request by Mr. Givens, defense counsel questioned Mr. Radnoti about each individual sampled he recovered[.]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The aforementioned testimony demonstrates that the conclusions of Mr. Radnoti's report were entered into evidence, even though the actual report was not entered into evidence as an exhibit. The actual report has little probative value outside of the conclusions, and the Court even questioned defense counsel's request to review each sample individually. Therefore, trial counsel's decision not to introduce the report into evidence was a tactical decision and does not amount to deficient performance. Accordingly, Mr. Givens' claim for ineffective assistance of counsel for failure to introduce Mr. Radnoti's report into evidence is hereby DENIED.

(Pet. Ex. D, 14-15).

The findings of the report were introduced at trial through Dr. Radoti's witness testimony. Givens fails to show how he was prejudiced in this regard. The state post-conviction court's determination was a reasonable application of *Strickland* and there is no cause to award federal habeas relief as to this claim.

## B. Claim Counsel Failed to Raise Proper Objections at Trial

Givens alleges trial counsel failed to object to certain comments made by the prosecutor in closing argument and to the testimony of a State's witness concerning measurements made of Givens' car and the victim's car. (Petition, p. 10). Givens also faults counsel for failing to object to the prosecutor's comment that he lied about his hair color and the prosecutor gave her personal opinion about a white cord that went to a coffee pot and a "yellow sticky note." *Id*. In rejecting this claims, state post-conviction court said:

Mr. Givens contends that his trial counsel performed deficiently because counsel did not object to several statements the prosecutor made during her closing argument and counsel did not "challenge the measurements taken by Jeffrey Cover of [Mr. Givens'] 1982 Ford Mustang during the search of his car. . . ." The objectionable statements made by the prosecutor pertain to Mr. Givens' hair color, Mr. Givens' description of a white cord found at the victim's residence, and the color of ink found on a "Post-It" note.

The characterization of Mr. Givens' hair color was a descriptor given by Mr. Clement, who observed a suspicious man outside of his store shortly after the murder occurred. In contrast to the Petitioner's allegations, the prosecutor did not state that Mr. Givens had black hair during her closing argument, but instead recited previous testimony that stated that Mr. Givens had dark hair. Defense counsel did not object to the prosecutor's statement regarding the Petitioners hair color, feeling that it would be a fruitless objection given the latitude afforded counsel during closing arguments. However, defense counsel did utilize a picture of Petitioner, during closing argument to emphasize that the suspicious man whom Mr. Clement saw may not have been Mr. Givens. Trial counsel explained that Mr. Clement told police that the suspect had a green fatigue jacket, and Mr. Givens never owned this type of jacket. Additionally, trial counsel stated that numerous people could have fit the description provided by Mr. Clement. The decision not to object to the prosecutor's statements was a tactical one.

*****************

During closing remarks, the prosecutor discussed the presence of a white cord in the victim's residence, and how Mr. Givens mistakenly believed that the cord was attached to a clock. Specifically, the prosecutor argued that:

> Albert Givens reviewed all of the evidence in this case. He reviewed the pictures. And he's trying to make a story that he thought would fit. But he made a mistake. It's not a clock. And it's not out of place. It's handing [sic] on the wall. It's a tapestry, where it's always been in her home. He saw a cord on the counter and so he thought that was a clock. [Ms. O'Connell] told you the chords go to the coffee maker and the little lamp there. Another lie that doesn't take sense.

*State v. Givens*, K-92-2270 December 5, 2066 Transcript p. 159-1.

Defense counsel responded to this argument during his closing remarks:

> Albert didn't say that that was a clock. What he said was that there was a clock inserted inside of that. And he knocked it out. He said the clock was inside of it. It was plastic. And it hit the ground. It's gone.

21

*Id.* at 188.  Again, defense counsel has decided to argue a different interpretation of the facts. The statements of Mr. Givens and Ms. O'Connell about the cord were introduced into evidence and the prosecutor is permitted to draw inferences. The decision not to object to the prosecutor's statements was in all likelihood a tactical one.

******************

Mr. Givens also asserts that his trial counsel should have objected to the prosecutor's statements abut  [sic] what color ink was on a "Post-It" note found at the victim's residence. The color of ink was relevant because Ms. Kilpatrick wrote a reminder on the note that she had a scheduled meeting with her son Jay. Defense counsel argued that this meeting was the reason Mr. Givens drove Jay to Ms. Kilpatrick's residence. During rebuttal, the prosecutor stated that the messages on the two sides of the "Posts-It" [sic] note were written in different colored ink. The prosecutor wanted to show the jury that this scheduled meeting may have occurred days or even weeks before Ms. Kilpatrick was actually murdered, which would rebut the assertion that the scheduled meeting occurred when Mr. Givens drove Jay to his mother's house. Although the "Post-It" note was not admitted into evidence, pictures of the note were admitted and both the prosecutor and defense counsel argued about the significance of the note during their closing remarks. [footnote omitted] Trial counsel appears to have made a tactical decision about how to handle the "Post-It" note.

******************

Mr. Givens also alleges that his trial counsel performed deficiently because they did not object to measurements taken by Jeffrey Cover. The measurements taken by Mr. Cover were the distance between the steering wheel and the front seat and the distance between the pedals and the front seat. Mr. Cover recorded these measurements for the victim's car and Mr. Givens' car, and then compared the two sets of measurements. Mr. Given states that the measurements were objectionable because he believes these measurements were "misleading and highly inaccurate." Trial counsel explained during the Post Conviction hearing that given the facts of the trial that he did not believe it was necessary to challenge the admissibility of the measurements. Trial counsel made a tactical decision about how to handle this issue.

(Pet. Ex. D, pp. 15-17).

As Givens failed to establish during state post-conviction proceedings that the prosecutor's comments in closing argument or the testimony about vehicle measurements were objectionable,  it follows that counsel's lack of objection did not constitute ineffective assistance. In the instant matter, even assuming arguendo that there was a basis for lodging an objection,

Givens fails to controvert the state court's finding that trial counsel's decisions in this regard were based on sound tactical considerations. Moreover, Givens fails to show how but for these alleged errors of omission, the outcome of his trial would have been different. Decisions of counsel are always subject to being second-guessed with the benefit of hindsight; however, tactical and strategic choices made by counsel after due consideration do not constitute ineffective assistance of counsel. Having reviewed the record in light of the deferential standard of review applicable to 28 U.S.C. § 2254 proceedings, the court concludes that the state post-conviction court's decision did not involve an unreasonable application of federal law or an unreasonable determination of the facts. This claim will be denied and dismissed.

### C.  Claim Counsel Failed to Move to Suppress Evidence

Givens faults his trial counsel for failing to move to suppress his wrench and toolbox. (Petition, p. 13). This claim was considered and rejected by the state post-conviction court which stated:

> Mr. Givens' final contention is that his trial counsel acted deficiently because counsel failed to file a motion to suppress a wrench and other tools that was [sic] located in the trunk of Mr. Givens' car. The wrench should not have been admissible, according to Mr. Givens, because the tool was recovered months after the murder occurred and there is no direct evidence that shows the wrench was the murder weapon. However, two experts who testified for the State explained that the impacts on the victim's head show that she was struck with an object of similar weight and design as the wrench. One of the experts, Dr, Fowler, actually testified that 'the wrench was likely the murder weapon [footnote 10]. Additionally, the wrench was the only tool out of the 162 tools found in Mr. Givens' toolbox that appeared to have been cleaned. Mr. Givens has not provided any information to support his contention that the wrench could have been excluded, other than the fact that the wrench was only linked to the crime by circumstantial evidence and not direct evidence. Mr. Givens' argument that the wrench was not relevant is without merit.
>
> During the Post Conviction hearing, Mr. Givens' trial counsel explained that the defense counsel in a previous trial filed a motion to suppress the wrench, which was subsequently denied [footnote omitted]

> Trial counsel also stated that he believed he was precluded from raising a motion to suppress based on the unique procedural history of this case. After his first trial, Mr. Givens filed a Petition for Post Conviction Relief which was granted by this Court. Trial counsel testified that the trial judge indicated that the Post Conviction relief only allowed Mr. Givens to receive another trial, and did not permit him to re-litigate the pre-trial motions.
>
> ********************
>
> [9] It is important to note that the defense called expert witnesses who directly contradicted the testimony offered by Dr. Fowler.
>
> [10] This issue was litigated during a suppression hearing prior to petitioner's first trial in 1993 and found to be without merit by the trial court at that time.

Pet. Ex. D, pp. 17-18.

The state post-conviction court's ruling is reasonable, corroborated by the record and entitled to deference on federal habeas review. The record shows that in one of Givens prior trials, counsel had moved to suppress the evidence and the motion was denied. (Resp. Ex. 15, pp. 97-98). Counsel cannot be faulted for deciding not to raise a previously denied motion. Further, defense counsel called three experts, Dr. Frank Peretti, Dr. Richard Callery, and Dr. James Gill, to refute the State's evidence based on the wrench and toolbox. (Resp. Ex. 7, pp. 4-64, 102-136 Ex. 15, p. 20).[8] The state court's finding that counsel's representation was based on strategic considerations was reasonable and does not warrant habeas relief. The claims will be denied and dismissed.

### D. Cumulative Errors of Trial Counsel

Insofar as Givens asserts that the cumulative effect of his trial counsel's alleged errors amounts to constitutionally deficient representation, this claim is factually and legally without merit. In the Fourth Circuit, the cumulative error doctrine is not generally recognized where

---

[8] Trial counsel testified at the post-conviction hearing that the forensic issues presented in this case were forensically complex. (Resp. Ex. 15, p. 95). For this reason, Patrick Kent, Esq. was brought into the case as co-defense counsel. *See supra* n. 5.

individual errors are not found to be constitutional errors because "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's actions deemed deficient." *Fisher v. Angelone*, 163 F.3d 835, 852 n. 9 (4th Cir. 1998); *see also Arnold v. Evatt*, 113 F.3d 1352, 1364 (4th Cir. 1997); *Higgs v. United States*, 711 F.Supp.2d 479, 551–52 (D. Md. 2010) (in the context of collateral review, relief based on the cumulative effect of errors is available only where individual constitutional errors are found).

None of the claims presented here demonstrates the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The cumulative error claim fails as a matter of fact and of law.

### 3. Claims of Trial Court Error

Givens contends the trial court: 1) denied his right to counsel; 2) was biased against him; and 3) issued a defective deadly weapon instruction. (Petition, pp. 8, 14). The state post-conviction court determined these claims procedurally defaulted because they were not raised on direct appeal and were bald allegations. (Pet. Ex. D, 6-7). As such, the claims are subject to dismissal as procedurally defaulted,[9] absent demonstration of cause and prejudice or of actual innocence, to excuse the default.[10] The post-conviction court's ruling reads in pertinent part:

> Mr. Givens argues that he should receive a new trial because the trial
> judge told instructed [sic] his attorneys not to speak with him during an

---

[9]  Defense counsel did not object to the trial court's comments at recess; thus, it appears the post-conviction court determined the post-conviction claim defaulted.

[10]  Givens' assertion of "structural error" in post-conviction proceedings is without merit and does not excuse procedural default .  (Pet. Reply, p 1).

over-night recess when his cross-examination was interrupted [foot note 2], and the trial judge did not give the jury a necessary instruction.

Presentation of witnesses and instructions to the jury are matters that pertain to the regularity of proceedings during trial, which may be reviewed on direct appeal if properly preserved, but not in a collateral proceeding. [citations omitted].

From what this Court can tell [footnote 3], the instruction that the Petitioner is referring to is an instruction on the definition of a "dangerous and deadly weapon."  It should be noted that during the Post Conviction hearing, trial counsel specifically stated that he did not request or desire a "dangerous and deadly weapon jury instruction because the State's alleged murder weapon, the wrench, could meet this definition.

*****************

[3]   The trial judgment did not permit Mr. Givens to speak with his attorneys during the over-night recess.  The Court specifically stated:

> For the record, the jury is out. And let me just say, Mr. Givens, because you are in the middle of your testimony, you are not allowed to discuss your testimony or questions you have been asked, not even your own attorneys, until your testimony is finished. Then you can resume discussing the case with them and so forth.

*State v. Givens*, K-92-2270 December 5, 2006 Transcript p. 274.

[4]   Petitioner's testimony is somewhat unclear with respect to this allegation.

*****************

Mr. Givens asserts that the trial judgment was not impartial and the State lost "arguably vital evidence… that would have severely impacted the State's case." Although Mr. Givens contends that the bias of the trial judge and the loss of this "arguably vital evidence" hindered his defense, he does not provide any specific relevant information about how these alleged circumstances inhibited his defense.  Mr. Givens does not explain how the trial judge acted with bias or how this alleged bias affected the case.

(Pet. Ex. D, pp. 6-7; *see also* Resp. Ex. 7 pp. 273-74.). [11]

Regarding Givens' claim he was prevented from consulting with his trial attorney during an overnight recess, the post-court explained that trial counsel testified that he would have not spoken to Givens out of concern that the State would likely question Givens before the jury about any conversation he may have had with his attorney during the over-night recess which could have the impact of looking "suspicious" to a jury, or lead to a State argument that Givens had been unfairly "coached" by counsel during the recess. (Pet. Ex. D*, n. 4). The post-conviction indicated that cross-examination was interrupted because trial counsel had an emergency and would testified that he have not been able to meet with Givens at the detention center on that night in any event. *See id; see also* Resp. Ex. 15, pp. 100-104; Resp. Ex. 7, pp. 272. Further, the post-conviction court found "no credible evidence that the Petitioner wanted to or needed to speak with trial counsel during this time frame." (Pet. Ex. D, n. 4).

The post-conviction court's rulings are supported in the record and do not constitute an objectively unreasonable application of federal law so as to require relief under the federal habeas statute. Petitioner has not met his burden to rebut the presumption of correctness of the court's factual findings, and fails to satisfy the standard for habeas relief. Accordingly, this claim will be denied and dismissed.

## CERTIFICATE OF APPEALABILITY

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this burden, an applicant must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were

---

[11]  The post-conviction court stated  Givens' claim  of "vital evidence" was generally alleged and does not support habeas relief. (Pet. Ex. D,  p. 7).

'adequate to deserve encouragement to proceed further.' " *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).  Givens has failed to make a substantial showing he was denied a constitutional right, and the court finds that reasonable jurists would not find the denial of habeas relief in this case debatable. Therefore, a certificate of appealability shall not issue.

## CONCLUSION

For the foregoing reasons, the court finds the petition provides no grounds for habeas corpus relief. A separate order denying the petition and declining to issue a certificate of appealability follows.


__July 21, 2014__                                      ____/s/_____
Date                                                          J. Frederick Motz
                                                                United States District Judge